# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ELIJAH BENTON, JR., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | )    **No. 3:08-0886** |
| YRC WORLDWIDE, INC. d/b/a | )    **JUDGE ECHOLS** |
| YELLOW TRANSPORTATION, INC., | ) |
| and YELLOW TRANSPORTATION, | ) |
| INC., | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM

Defendants YRC Worldwide, Inc., and Yellow Transportation, Inc., (collectively "Yellow")

filed a Motion for Summary Judgment (Docket Entry No. 20), to which Plaintiff Elijah Benton, Jr.,

("Benton") filed a response in opposition (Docket Entry No. 27), and Yellow filed a reply (Docket

Entry No. 31).

Benton is an African American who resides in Montgomery County, Tennessee. Yellow is

located in Davidson County, Tennessee. Between August and October 2007, Yellow employed

Benton as a part-time or "casual" forklift driver on its loading dock. Benton claims Yellow

disciplined him and ultimately terminated his employment due to race discrimination and that

Yellow subjected him to a racially hostile work environment. Benton brings his claims under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and

the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* (hereinafter "THRA").

Benton seeks compensatory and punitive damages, front pay, back pay, injunctive relief, attorney's

fees, costs, and prejudgment interest.

1

The record does not contain copies of Benton's administrative charge filed with the Equal Employment Opportunity Commission ("EEOC") or the right-to-sue letter Benton received from the EEOC. Thus, the Court cannot determine whether Benton's Title VII race discrimination claim is timely brought. The Court must assume that Benton met the Title VII prerequisites for his race discrimination claim as Yellow does not contend otherwise.

It is undisputed by the parties that Benton made no mention of his hostile work environment claim in his administrative charge of discrimination. Further, Benton does not now argue that his hostile work environment claim should be analyzed under Title VII as a claim that could be reasonably expected to grow out of his EEOC charge on race discrimination. See Strouss v. Michigan Dept. of Corrections, 250 F.3d 336, 342 (6th Cir. 2001); Jones v. City of Franklin, 309 Fed.Appx. 938, 943-944 (6th Cir. 2009). Therefore, Benton's claim of a racially hostile work environment is brought under 42 U.S.C. § 1981, see Jackson v. Quanex Corp., 191 F.3d 647, 657-658 (6th Cir. 1999) (observing claim of racially hostile work environment may be brought under § 1981) and the THRA; however, in analyzing this claim, the Court may utilize cases decided under Title VII. See Newman v. Federal Express Corp., 266 F.3d 401, 406 (6th Cir. 2001); Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996) (noting state courts' analysis of THRA claim is the same as the analysis under Title VII).

## I. FACTS

Benton graduated from high school in 1977 and served twenty (20) years in the Army, retiring as Sergeant First Class with an honorable discharge in 1998. While serving in the Army, Benton obtained 57 semester hours of college work in business management. (Docket Entry No. 32-1, Benton Depo. at 15-16, 18-20.)

2

Upon his discharge from the Army, Benton worked in a variety of positions. Since August 2006, he has been employed full-time as a fire control technician for a Fort Campbell contractor. As a fire control technician, Benton builds and tests field artillery housing. He initially worked for J & J/BMAR, but on May 1, 2008, the name of the contractor changed to DynCorp International. Benton did not experience a lapse in employment when the contractor's identity changed. Benton enjoys his job at Fort Campbell.

In the summer of 2007, Benton was working forty (40) hours a week at Fort Campbell from 7:30 a.m. to 4:00 p.m., Monday through Friday. Benton sought a second job to help pay off debt from a former business venture. He sent his resume to Yellow in August 2007 and obtained a job as a casual employee working on the loading dock. Benton testified he "was looking for part-time, maybe even full-time" work, but he was not going to leave Fort Campbell until he was guaranteed a benefit package with career progression and an increase in salary. (Docket Entry No. 22-1, Benton Depo. at 34.) He told Yellow on his application that he only wanted a part-time job. (Id. at 34-35.) Benton worked at Yellow as a casual employee until his employment there was terminated on October 12, 2007.

Benton's opinion is that he did a good job at Yellow. He liked working there and regards Yellow as a good place to work. Benton testified he worked under two different supervisors: Glen Pakis and Jose (last name unknown), who rotated weekdays and weekends. (Id. at 39.) Benton thought he got along with Jose okay. (Id. at 94.) When asked if he got along with Pakis, Benton responded: "Yes. I stayed my distance and did my job; that's all I did. If he come over to me and say, Hey, I need you to go and do this right here, I'd stop what I was doing and go and do it, do what he required, and then go back to whatever I was originally doing." (Id. at 94-95.)

3

As a casual employee, Benton was expected to call in every evening after 5:00 p.m. to see if there was work available for him at Yellow that evening. Generally speaking, Benton would work from 8:30 p.m. to 4:00 a.m. at Yellow, while continuing to work from 7:30 a.m. to 4:00 p.m. at Fort Campbell. Benton averaged 32 to 36 hours a week at Yellow and he did not always have to call in because Pakis and the other supervisor would tell him to come to work the next day. (Id. at 37.) Casual employees were required to work ninety (90) days before they could become members of the union.

Prior to working at Yellow, Benton had not been involved in loading or unloading freight. Benton received an orientation when he began work at Yellow. He also received a copy of Yellow's work rules and signed a receipt indicating he had received Yellow's Policy Guide to Workplace Conduct. The receipt also stated: "I have or will read them and understand the necessity of knowing and complying with Department of Transportation, EPA, and Company policies and regulations."

Yellow's Equal Employment Opportunity Policy states: "The Company follows all applicable EEO laws in its employment practices and procedures, and provides equal employment opportunity to all persons without regard to race . . . and any other characteristic protected by federal, state or local law." The policy also prohibits racial harassment, provides a mechanism for raising complaints of racial harassment and states: "There will be no retaliation against any person in lodging a complaint of harassment, even if the investigation produces insufficient evidence to support the complaint, and even if the accusations cannot be proven." The policy also states: "All perceived incidents of harassment and discrimination that may violate the law or the Company's policies must be reported immediately. Contact the designated Human Resource Manager for your area as shown below, or contact the Employee Relations Manager at the General Office, 800-458-

4

3322, or 913-344-3113." Benton did not make any complaint under Yellow's Equal Employment Opportunity Policy, but he claims that acts of discrimination and racial hostility were performed by supervisors or out in the open in front of supervisors.

Benton's claims of race discrimination and a racially hostile work environment are based on the following incidents. First, during his orientation, Benton was required to follow more seasoned white employees for three nights, although Benton was told such "shadowing" would last only a few hours, and a younger white employee was required to "shadow" a seasoned employee only on the first night. Benton did not complain to anyone about this; rather, he "went with the flow." (Benton Depo. at 44.) When Benton asked why he was required to "shadow" another employee for so long, he was allowed to work on his own. (Id. at 43.)

Second, at the end of September, Benton saw a group of six white employees drive their forklifts down a ramp outside to the parking lot where they gathered to talk and take a smoke break. Benton joined them to smoke a cigarette and then drove his forklift back up the ramp onto the loading dock. Glen Pakis stopped Benton and said, "You don't go down that ramp with a forklift for a break. Do you understand?" (Id. at 45-47.) Benton responded, "Okay. Not a problem. I said, All right." (Id. at 46.) Pakis then stated he wanted to make sure Benton understood that forklifts were not to go down the ramp to take a smoke break. Benton replied, "Check. I understand." (Id.)

Thereafter, a full-time white employee asked Benton what Pakis had said to him. After Benton explained, the white employee stated: "That dude is a trip; he's probably saying that because you['re] black." The white employee also said, "You know, blacks don't last around here long." When Benton asked why he said that, the employee replied, "Just look around; how many do you

5

see?" (Id. at 46-47.) Benton said, "Oh," shook his head, and drove his forklift to his area of work. This made Benton feel very uncomfortable, but he did not complain to anyone. (Id.)

Third, when the horn blew for break time, four or five white, non-supervisory dockworkers (at different times) would go into an office and play a taped Tarzan song over the intercom. At the end of the song, horns blew, and the white employees then said, not over the intercom, "It's time for the monkeys to take a break and they'd better hurry up before they get stampeded." Then the white employees would look at the black employees and start laughing like it was funny. (Id. at 49-50, 53.) Glen Pakis was in his office when this took place and the workers were on the loading dock. (Id. at 50-51.) This would occur three or four times a week. (Id. at 53.) The record does not reveal whether the white employees played the Tarzan tape from Pakis's office nor does the record reveal the distance between Pakis's office and the loading dock. Benton did not complain to Pakis about his co-workers' behavior because he felt he could not talk to Pakis about something like that. (Id.)

Fourth, Pakis chastised Benton for taking a break and urged him to pick up his work pace on the same day that Benton saw two white employees sitting on their forklifts and conversing for 2½ hours, but Pakis said nothing to them. Benton did not know who the white employees were, what they were talking about, or whether they were disciplined. (Id. at 55-56.) On one occasion, Benton witnessed Pakis telling white employees to "watch how you say things around them," meaning black employees. (Id. at 76.)

Fifth, Benton entered the break room on one occasion. The white employees turned the television channel to what they wanted to watch and they used the word "nigger" while they were talking to each other. (Id. at 57.) Benton did not testify that his co-workers directed the epithet to him. No supervisor was present in the break room when this occurred. Benton did not know who

6

the white employees were, and he did not complain about the incident because he felt there was no one to whom he could complain. He refused to return to the break room. (Id. at 57-58.)

Sixth and finally, Benton believed that white employees were more often assigned to work with palletized freight, which was easier to handle, than were black employees. However, Benton also testified that "the freight that we usually get is freight that's docked on pallets." (Benton Depo. at 54.) Also, if white employees opened up trucks and found the freight leaning, they returned their paperwork packets to the office and asked to be re-assigned to different trucks. Thereafter, black employees were directed to handle the trucks with the listing freight. The black employees became frustrated with the back-breaking work and quit, but Benton was determined to stay. (Id. at 64.)

Benton does not know any dock supervisors by the names of Brian Hoffman, Bill Schmidt, Paul Arnold, or Chad Crawford. (Id. at 40.) On September 1, 2007, Brian Hoffman completed a "Casual Evaluation" concerning Benton. He rated Benton's dock productivity at 1.20, but answered "Yes," to "accurate dock paperwork," "works well without other employees," "works well without excess delay; talking, etc." and "reports back immediately at the end of each assignment." (Docket Entry No. 22-2, Ex. 1.) In the space following "Does he/or she accept and adjust to corrections" Hoffman wrote, "no, I asked if he has any questions about anything for the past two nights. He says 'no' and just keeps moving slowly." Hoffman indicated he would not recommend Benton for hire and added in his handwriting: "No sense of urgency. Could care less about being here." (Id.)

On October 5, 2007, "Casual Evaluations" concerning Benton were completed by three different dock supervisors, but the record does not explain why these three evaluations were completed by three different people on the same day. In the first one, Chad Crawford rated Benton's dock productivity and paperwork accuracy as "poor" and indicated that Benton did not work well

7

without other employees, work well without excess delay, or adjust to correction. He also indicated that Benton did not always report back immediately at the end of each assignment. He emphatically did not recommend Benton for hire and wrote: "Spends more time talking [than] working." (Docket Entry No. 22-2, Ex. 4.)

In the second evaluation dated October 5, apparently signed by Paul Arnold (or Arnow), the dock supervisor rated Benton's dock productivity at 2.98 and agreed that Benton reported back immediately at the end of each assignment. However, he left most of the other spaces blank and wrote that Benton was too slow and he would not recommend him for hire. (Id., Ex. 5.)

In the third evaluation, dock supervisor Bill Schmidt reported that Benton had a "poor attitude," his dock paperwork was "poor," and Benton "talks a lot." Schmidt also wrote he was not sure Benton understood when coached, as Benton gave no response when coached. Schmidt also did not recommend Benton for hire. (Id., Ex. 6.)

On October 6, 2007, Brian Hoffman filled out a "Record of Verbal Counseling" and a "Casual Evaluation" on Benton. In the "Record of Verbal Counseling," Hoffman summarized the problem as follows: "Had to re-direct Casual Benton on 3 different occasions to get back to work. I asked him to go back to work & he said he was working. He was not!" In the section entitled, "Summary of expectations to correct or improve:" Hoffman wrote: "As has been documented in the past by myself, Benton has NO sense of urgency. He could care less about working. He needs to be cut off!" Instead of signing the document in the place meant for the "Manager's Signature" Hoffman signed in the spot for the "Employee's Signature." Benton's signature does not appear on the document, and Benton testified he had not seen the document before. (Docket Entry No. 32-1, Benton Depo. at 78.)

8

In the October 6, 2007 "Casual Evaluation," Hoffman rated Benton's dock productivity at .60, although he indicated Benton's dock paperwork was accurate. He noted that Benton did not work well without excess delay because he talked. Hoffman also denied that Benton reported back immediately at the end of each assignment or accepted and adjusted to correction. Hoffman wrote: "Asked Benton to get back to work in 76 door on 3 different occasions and he said he was working. He was sitting on his motor doing nothing." (Docket Entry No. 22-2, Ex. 8.) Hoffman did not recommend Benton for hire and stated he "should be cut off." Hoffman listed excess delay, talking, poor attitude, laziness and no sense of urgency as reasons why Benton should be cut off from further casual employment.

Sometime in early October, Benton unintentionally damaged a 55-gallon drum containing solvent while driving the forklift. He and other employees cleaned up the spill and then Benton left the drum on the dock positioned so that no further solvent would leak out. A white employee notified Pakis of the incident and then told Benton that everything was taken care of. (Id. at 73-75.) On the next evening shift, Pakis asked Benton if he had damaged the drum, and Benton admitted that he had. According to Benton, Pakis said, "Well, you [are] probably going to get counseled about this later on, but don't worry about nothing. I just need you to run the freight. And you're probably going to get it mailed to you in the mail if it will come. Because they frown on puncturing barrels." (Id. at 73.) Benton replied, "Okay." (Id.) According to Benton, that is all that was said and he did not hear anything else about the barrel. He did not receive written counseling in the mail. (Id.) Benton was aware of only one white employee who damaged a 55-gallon drum. He did not know the employee's name, whether he was a casual employee, or whether he was disciplined.

9

On a Thursday in October, Benton went to Yellow to pick up his paycheck. According to Benton, Glen Pakis told Benton that he would love to have Benton back, but to call Valerie in the morning and talk to John.[1] Benton called Valerie and told her Pakis instructed him to call. When Benton identified himself, Valerie told him his employment was terminated. Benton asked the reason why and Valerie responded that he had been counseled seven times by four different supervisors. Benton asked when this had happened because he knew nothing about it. Benton denies that he was reprimanded verbally or in writing. (Benton Depo. at 59-60.)

Benton asked Valerie why someone had not talked to him if he had been written up seven times by four different people. According to Benton, Valerie responded, "They did." Benton disagreed and told her that no one had talked to him. He was under the impression he was doing a good job. Valerie told him there was nothing she could do for him and Yellow would send him his last paycheck. She told him his employment was terminated effective immediately. Benton said okay, and thereafter contacted the EEOC. Benton denied that any supervisor ever told him three times to get back to work. (Id. at 61.)

Pakis, who was the shift operations manager at Yellow before he retired on April 30, 2009, testified that written evaluations of casual employees were not necessary, and if a casual employee was not doing his job, Yellow would simply cut him off from further employment. Pakis supervised a crew of dock supervisors, eight (8) to twelve (12) of whom worked each day. The dock supervisors were the front-line supervisors who primarily filled out evaluation forms for casual employees. According to Pakis, casual employees were not required to sign the evaluations and

---

[1]The Court surmises that "John" was John Yokosuk, general operations manager, and Pakis' supervisor. (Docket Entry No. 33-1, Pakis Depo. at 9.) "Valerie" was Valerie Ellis, office manager. (Id. at 12.)

typically the dock supervisor did not review the evaluations with the casual employees; however, disciplinary actions would be discussed with the employees. Pakis did not recall any of the front-line supervisors filling out written job performance evaluations on Benton. Pakis further testified that Benton was not one of Yellow's best casual employees, and Benton would not be one he would call in to work if he needed ten (10) workers, but he might call Benton if he needed fifteen (15) workers on shift. Pakis agreed, however, that from August 31 to October 12, 2007, Benton worked more hours than the vast majority of casual dock workers. Pakis remembered an incident when a dock supervisor, Johnny Miller, saw Benton on his forklift in the yard smoking a cigarette, which was a safety violation, and Pakis seemed to remember that Benton was confronted about the matter, but he did not recall if he was the one who confronted Benton. Pakis testified that white forklift operators had committed the same safety violation, but not at the time Benton was caught because he was the only one on the yard at the time. Pakis was not aware Benton's employment was terminated because a decision to terminate a casual employee was usually the terminal operations manager's decision and in 2007 that would have been Russell Rieves. Pakis did recall that he issued written discipline to Benton for unintentionally puncturing a 55-gallon drum.[2] (Docket Entry No. 22-3, Pakis Depo. at 13, 16-22, 24-25-27; Docket Entry No. 27-4.)

Valerie Ellis testified that she processed termination paperwork, but she did not have any involvement in the decision to terminate casual employees, including Benton. Casual employee

_____

[2]Pakis acknowledged an incident that occurred earlier this year, before he retired on April 30, when a Yellow employee, who did not work on Pakis's shift, was discharged from employment for having a noose on his tow motor. (Pakis Depo. at 24.) Pakis did not know of any similar employee conduct like that in his twenty-five (25) years of experience at Yellow. (Id.) Because this early 2009 incident occurred approximately eighteen (18) months after Benton's employment terminated in October 2007, the Court does not believe this evidence is relevant and admissible in the instant case. Fed.R.Civ.P. 401.

evaluations are turned in to her for filing and for her to bring to the general operation manager's attention if a casual employee is not steadily working when there is work available. Ellis was not involved in any disciplinary action against Benton. She did not recall Benton raising any concern with her about the number of times he had been evaluated. When he called, she told him his employment was terminated due to performance. The HR department handles complaints of race discrimination. Russell Rieves and Ellis usually are involved in such complaints. Ellis had not heard statements made at Yellow that blacks do not last very long in certain jobs, and Benton did not complain to her that he was discriminated against based on race. (Docket Entry No. 22-4, Ellis Depo. at 17-20, 41-42.)

Since October 12, 2007, there has not been a day when Benton was too ill to work, either physically or mentally. He has not seen any doctor except for his regular physician, who treats him for a high blood pressure condition first diagnosed in 1991. He has not seen a psychiatrist, psychologist, or social worker as a result of his employment termination at Yellow. Benton has continued to enjoy his married life, his hobbies, and his recreational interests as before the termination. About the time Yellow terminated Benton's part-time employment, Benton began working sixty (60) hours a week at Fort Campbell. Due to the overtime at his full-time job, he did not need to find another part-time job.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have

been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

**A.  Race discrimination**

Benton has produced no direct evidence that he lost his part-time job at Yellow due to overt racial discrimination against him.  Rather, he points to circumstances which, when considered together, he claims should compel the conclusion that his job termination was the result of race discrimination.  Thus, the Court will proceed in its analysis under the burden-shifting framework of McDonnell-Douglas/Burdine.  See Alexander v. Local 496, Laborers' Int'l Union of North Am., 177 F.3d 394, 402 (6th Cir. 1999).

13

To establish a *prima facie* case of race discrimination, Benton must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by, or treated differently than, a similarly situated employee who is not a member of the protected class. See Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 828 (6th Cir. 2000). If Benton establishes a *prima facie* case, an inference of discrimination arises. See Laderach, 207 F.3d at 828. The burden of production then shifts to Yellow to articulate a legitimate, non-discriminatory reason for the adverse employment action. See id. Once that reason is identified, the burden shifts back to Benton to produce evidence that Yellow's articulated non-discriminatory reason for its action was merely a pretext for unlawful race discrimination. Id. To show pretext, Benton must prove that Yellow's asserted reason had no basis in fact, the reason did not in fact motivate the adverse employment action, or the reason was insufficient to motivate the adverse employment action. Id. Benton carries the ultimate burden to prove race discrimination by a preponderance of the evidence. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995).

Yellow contends that Benton cannot meet the third and fourth elements of his *prima facie* case of race discrimination. Yellow maintains that Benton was not qualified for his position because he punctured a 55-gallon drum with the forklift and Benton has produced no evidence that he was treated differently than a similarly-situated non-minority employee.

Taking the evidence in a light most favorably to Benton, the Court finds that Benton has produced sufficient evidence to show that he was qualified for his position. Benton admitted his mistake when Pakis asked him about puncturing the drum and Pakis testified that Benton did not intend to cause the damage. Further, Benton testified that Pakis acted as if the incident was not that

14

important, and Pakis agreed that Benton's unintentional damage to the barrel was not "a cardinal sin" for disciplinary purposes. (Docket Entry No. 33-1, Pakis Depo. at 11, 18.) While Pakis recalled that he sent a written disciplinary letter to Benton by mail concerning the 55-gallon drum, Benton denied that he ever received such a letter, and the record does not contain such a letter. Thus, taking all of this evidence in favor of Benton, he has produced sufficient evidence to meet the third element of his *prima facie* case that he was qualified for his job.

A closer question exists as to whether Benton has produced sufficient evidence that he was treated differently than a similarly-situated white employee. Benton testified that he was aware of only one white employee who damaged a 55-gallon drum, but he did not know the employee's name, whether he was a casual employee, or whether he was disciplined for the damage. Thus, without more information, the Court is unable to analyze whether that employee's circumstances were in all relevant respects comparable to Benton's situation. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998).

In any event, in his response to the summary judgment motion, Benton compares himself to white casual employee Alton Carter, who received a warning letter from Yellow on October 10, 2007, close to the time Benton damaged the 55-gallon drum. The letter addressed to Carter stated that, on September 30, 2007, Carter unloaded a trailer that held an Exact Express shipment destined for "HVA." (Docket Entry No. 27-2.) Records showed that Carter transferred the shipment to another trailer, but the shipment did not arrive on time and was lost in the system for twenty-four (24) hours. Yellow informed Carter that his "negligence resulted in an Exact Express failure and a dissatisfied customer." (Id.) Carter was warned that subsequent occurrences of a similar nature

15

may result in discipline up to and including discharge. The letter was signed by John Yokosuk, General Operations Manager. (Id.)

Benton claims that on October 12, 2007, two days after Yokosuk drafted the letter to Carter, dock supervisor Brian Hoffman completed a positive "Casual Evaluation" on Carter, ranking his dock productivity at 4.39. (Docket Entry No. 27-2 at 2.) Hoffman also indicated that Carter's dock paperwork was accurate, he worked well without other employees, he worked well without excess delay, and he reported back immediately at the end of each assignment. Hoffman also wrote: "Very solid in all aspects of the job. Has experience and a good attitude." Hoffman recommended Carter for hire as a full-time employee. (Id.) Benton provides a copy of another "Casual Evaluation" that was completed for Carter on September 1, 2007, indicating he was a "no show." The Court cannot make out the signature of the supervisor who completed the September evaluation.

To be deemed similarly-situated in the disciplinary context, Benton must compare himself with a non-minority individual who dealt with the same supervisor, who was subject to the same standards, and who engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish the conduct or Yellow's treatment of them for the conduct. See Ercegovich, 154 F.3d at 350. Benton denied that he was ever orally reprimanded on the job or that he received a written disciplinary letter for puncturing the 55-gallon drum. Because Benton claims that he was never disciplined, it seems curious that Benton wishes to compare himself to a white employee who was disciplined in writing. In any event, comparing Benton to Carter, other significant differences are apparent.

While Benton and Carter both dealt with dock supervisor Brian Hoffman, Carter's reprimand letter was sent by John Yokosuk, while Benton claimed he dealt only with supervisor Glen Pakis

16

concerning the drum-puncturing incident. It appears that Carter and Benton, who were both casual employees, were subject to the same standards. The two men did not engage in the same conduct, however. Benton unintentionally punctured a drum with a forklift causing a spill. Carter failed to transfer a shipment from one trailer to another, resulting in its loss in the system for 24 hours, even though Carter's paperwork showed that he made the transfer. Thus, the two men did not engage in the same conduct. Moreover, the summary judgment record does not contain any testimony or other evidence explaining Yellow's typical disciplinary response to the type of error Carter committed or comparing the severity of Carter's error to Benton's error. Finally, it appears that Brian Hoffman, a dock supervisor of both men, came to different conclusions about the ongoing performance of the two casual workers. Carter was rated as more productive and experienced and showed a good attitude. To the contrary Benton received far lower productivity ratings from several dock supervisors and he was criticized for working too slowly, talking too much and displaying a poor attitude. When the two workers are compared, it does not appear that they were similarly situated in all relevant respects. See Ercegovich, 154 F.3d at 350. By failing to prove the fourth element, Benton cannot establish a *prima facie* case of race discrimination.

Even if the Court assumes that Benton did prove a *prima facie* case, Yellow produced evidence of a legitimate, non-discriminatory reason for ending Benton's employment. As just stated, Yellow dock supervisors did not consider Benton to be a productive and speedy worker and they noted his poor attitude and his lack of response when coached on the job. The supervisors assessed him as engaging in conversation with others when he should have been working. As a result of their observations, they did not recommend Benton for permanent hire.

17

The burden then shifts back to Benton to show that Yellow's proffered reason was a pretext for race discrimination. Other than his own self-serving statements that he thought he was doing a good job, Benton has not directly challenged the supervisors' evaluations finding that Benton was not performing in accordance with Yellow's expectations. Benton must come forward with evidence to refute the legitimate, non-discriminatory reasons given for his discharge. See Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986). Benton's perception of himself is not relevant. Rather, it is the perception of the decision maker that is relevant. See id. at 464-465.

The other evidence Benton produces does not show racial animus on the part of the supervisors who participated in his firing. Benton produces absolutely no evidence of racial animus on the part of the dock supervisors and, in fact, he claims not to even know who they were. Thus, Benton has not shown that a racial motive played any part in the evaluations written by Brian Hoffman, Bill Schmidt, Paul Arnold, or Chad Crawford. The record indicates that one or both of the higher-level managers, Russell Rieves and John Yokosuk, made the decision to end Benton's employment and that Valerie Ellis communicated the termination to Benton. However, Benton has not produced any evidence that these supervisors and managers were motivated by racial animus against him or anything other than the content of the "Casual Evaluations" they received concerning Benton's performance.

Benton claims that Pakis was present when Benton's co-workers played the Tarzan song and called the black employees "monkeys" at the start of breaks, that Pakis reprimanded Benton on one occasion for taking a short break and urged him to step up his pace even though two white employees were sitting on their tow motors talking, and that Pakis chastised Benton for taking a forklift into the yard to smoke a cigarette when white employees did the same thing. As to the use

18

of the Tarzan song, Benton testified that Pakis was in his office when Benton's coworkers played the tape on the intercom and that coworkers called the black employees "monkeys" on the loading dock, not over the intercom. There is no evidence before the Court that Pakis heard the workers' discriminatory remarks and failed to intervene, and Benton admitted that he never complained to any supervisor about his coworkers' remarks. See Ercegovich, 154 F.3d at 354 ("An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of . . . discrimination.")

Even taking as true that Pakis told white employees to watch what they said around black employees, that Benton was called in to work more often than most casual employees, and that Pakis reprimanded Benton for taking a smoke break on a forklift and urged him to pick up the pace when he did not do the same to white employees, there is still insufficient evidence of pretext with regard to Pakis' conduct. Benton testified that, when he went to pick up his paycheck in October 2007, Pakis told Benton he would love to have Benton on the job, but Pakis told Benton to call Valerie and talk to John. When Benton did so, he learned he was fired. Thus, Benton's own testimony does not confirm that Pakis was the one who terminated his employment or that Pakis was motivated by racially discriminatory animus and had Benton fired based on his race.

The only person besides Benton who attempted to assign any discriminatory motivation to Pakis was the unidentified coworker who said to Benton after he was reprimanded for smoking on a forklift, "That dude is a trip; he's probably saying that because you['re] black. You know, blacks don't last around here long." Not only are these coworker statements inadmissible hearsay as presented, they are merely the subjective beliefs of the coworker whom Benton has not shown to have any decision-making authority for Yellow. See Barner v. Pilkington North Am., Inc., 399 F.3d

745, 750 (6th Cir. 2005); Ercegovich, 154 F.3d at 354; Giles v. Norman Noble, Inc., 88 Fed.Appx. 890, 895 (6th Cir. 2004).

Benton's other complaints–having to shadow a more seasoned employee longer than a white employee during orientation, hearing coworkers on one occasion use the "n" word in the break room when no supervisor was present, and the assignment of black employees to difficult freight loads more often than white employees–also do not establish that Yellow's stated reasons for ending Benton's employment were a pretext for race discrimination. Benton acknowledged that he was allowed to proceed on his own after orientation when he stated he was ready to proceed. The use by co-workers of the "n" word, while deplorable, did not interfere with Benton's work or his opinion that Yellow was a good place to work. Even if black employees were more often assigned to difficult freight loads than white employees, Benton testified he willingly handled his assignments. Benton did not complain to management about any of these events or incidents, nor has he shown how these events or incidents establish pretext for management's decision to fire him based on poor performance.

For all of these reasons, the Court concludes that Benton has not produced sufficient evidence of race discrimination to proceed on his claim at a jury trial.

**B. Racially hostile work environment**

A hostile work environment exists if the workplace is permeated with racially discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the plaintiff's employment, and if an objectively reasonable person would view, and the plaintiff himself did view, the environment as abusive. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 81 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).

20

To establish a prima facie case of a hostile work environment, Benton must show five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). The law does not prohibit all verbal or physical harassment in the workplace; it is directed only at intentional discrimination based on a protected category, such as race. See Oncale, 523 U.S. at 80; Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000).

In determining whether the alleged harassment was sufficiently severe and pervasive, the Court must consider the totality of the circumstances. Williams v. General Motors Corp, 187 F.3d 553, 562 (6th Cir. 1999). The Court must take into account the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Harris, 510 U.S. at 23. Moreover, personal conflict "does not equate with discriminatory animus." Morris, 201 F.3d at 791; Barnett v. Department of Veterans Affairs, 153 F.3d 338, 342-343 (6th Cir. 1998).

Benton has not presented sufficient evidence that a reasonable person would find that racial harassment at Yellow was severe and pervasive or that it had the effect of unreasonably interfering with Benton's work performance by creating an intimidating, hostile, or offensive work environment. See Smith v. Leggett Wire Co., 220 F.3d 752, 760-761 (6th Cir. 2000). Benton complains that co-workers used the "n" word on one occasion when he visited the break room and thereafter he refused to use the break room, and that at the start of breaks three or four times a week his coworkers played the Tarzan song over the intercom and stated on the loading dock that it was

time for the monkeys to take a break.  The coworker use of the "n" word on one occasion, while offensive, was isolated.  Coworkers' use of the Tarzan song and monkey remark also could be construed as offensive, but the comments were not physically threatening.  Benton was employed at Yellow only between August and early October 2007.  Even if repeated use of the "monkey" remark amounted to severe and pervasive harassment, it is undisputed that Benton did not complain to management about any racially hostile conduct so that management could have an opportunity to end the conduct, and Benton produced no evidence that these events, or any of the other incidents which he claims to be racially discriminatory, interfered with his work performance or with his opinion that Yellow was a good place to work.  See Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) (holding hostile work environment claim not actionable where environment did not impede plaintiff's work performance and she claimed to like her job).  According to Benton, he continued to perform his job adequately and he did not suffer any ill effects that affected his work or his personal life, including his marriage, additional full-time job, hobbies, and other interests.  Thus, the Court concludes that Benton's hostile work environment claim fails for lack of evidence.

## IV.  CONCLUSION

For all of the reasons stated, Defendant's Motion For Summary Judgment (Docket Entry No. 20) will be granted and this case will be dismissed with prejudice.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

22